1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11  CONSERVATION CONGRESS and              No.  2:11-cv-02250-MCE-CMK
    CITIZENS FOR BETTER FORESTRY,
12
            Plaintiffs,
13                                          **MEMORANDUM AND ORDER**
            v.
14
    SHARON HEYWOOD, UNITED
15  STATES FOREST SERVICE, and
    UNITED STATES FISH AND
16  WILDLIFE SERVICE

17          Defendants.

18

19          This case arises out of the approval of the Gemmill Thin Project (also referred to

20  as the "Project") in the Shasta-Trinity National Forest ("STNF") by Defendants United

21  States Forest Service, Forest Supervisor Sharon Heywood[1] (collectively "USFS"), and

22  United States Fish and Wildlife Service ("FWS") (collectively "Defendants").  According to

23  Plaintiffs Conservation Congress and Citizens for Better Forestry (collectively

24  "Plaintiffs"), Defendants violated the Endangered Species Act ("ESA"), the National

25  Forest Management Act ("NFMA"), the National Environmental Policy Act ("NEPA"), the

26  Administrative Procedure Act ("APA"), and the statutes' implementing regulations.  More

27  _____

28          [1] In July 2013, David R. Myers assumed the role of Forest Supervisor and has substituted into this
    litigation for Sharon Heywood pursuant to Fed. R. Civ. P. 25(d).

                                              1

specifically, Plaintiffs contend that the Project will significantly impact the habitat for the Northern Spotted Owl (also referred to as "NSO" or the "Owl"),[2] a threatened species under the ESA.[3]  Currently before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 24), Defendants' Cross-Motion for Summary Judgment (ECF No. 29), and Defendants' Motion to Strike (ECF No. 28).  On April 23, 2015, the Court held a hearing on these Motions before taking them under submission.  This Memorandum and Order serves as the Court's formal ruling on the pending Motions and supersedes anything said during the hearing.  For the reasons stated below, Defendants' Cross-Motion for Summary Judgment is GRANTED, Defendants' Motion to Strike is GRANTED, and Plaintiffs' Motion for Summary Judgment is DENIED.

**LEGAL PRINCIPLES**

A.    **Endangered Species Act (ESA)**

Once a species is listed as threatened or endangered, the Secretary of the Interior (through the FWS) typically designates critical habitat.  16 U.S.C. § 1533(a)(3)(A).  As relevant here, critical habitat is the specific areas within the geographical areas occupied by the species at the time of listing on which are found the physical or biological features essential to the conservation of the species and which may require special management.  Id. § 1532(5)(A)(i).  Critical habitat designation does not place the land "off-limits" to projects or development; it requires federal agencies to ensure that their actions will not destroy or "adversely modify" the value of the critical

_____

[2] The NSO is a medium-sized owl with dark eyes, dark-to-chestnut brown coloring, with whitish spots on the head and neck and white mottling on the abdomen and breast.  The NSO inhabits structurally complex forests from southwest British Columbia through the Cascade Mountains and coastal ranges in Washington, Oregon, and California (as far south as Marin County).  First Amended Complaint ("FAC"), ECF No. 18, ¶ 94.

[3] An "endangered species" is "any species which is in danger of extinction throughout all of a significant portion of its range."  16 U.S.C. § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  Id. § 1532(20).  The FWS listed the NSO as a threatened species in 1990.  55 Fed. Reg. 26114 (June 26, 1990).

1   habitat designation for the conservation of the species.  Id. § 1536(a)(2).

2          For each listed species, the Secretary of the Interior also typically develops a

3   recovery plan that describes site-specific management actions necessary to achieve the

4   conservation and survival of the species and includes objective, measurable criteria for

5   when the species should be removed from the endangered or threatened list.  Id.

6   § 1533(f)(1)(B).  While useful in evaluating an action's impact on the species' recovery,

7   "recovery plan objectives are discretionary for federal agencies."  Cascadia Wildlands v.

8   U.S. Bureau of Indian Affairs, No. 6:13-cv-1559-TC, 2014 WL 2872008, at *4

9   (D. Or. June 24, 2014).

10         Under Section 7(a)(2) of the Act, each federal agency, in consultation with FWS,

11  must ensure that any action authorized, funded, or carried out by the agency is not likely

12  to jeopardize the continued existence of any listed species, or result in the destruction or

13  adverse modification of the designated critical habitat of the species.  16 U.S.C.

14  § 1536(a)(2).  In fulfilling this obligation, each agency is required to "use the best

15  scientific and commercial data available."  Id.  To assist agencies in complying with this

16  provision, the ESA regulations set out a detailed consultation process for determining

17  the biological impacts of a proposed activity.  16 U.S.C. § 1536; 50 C.F.R. §§ 402.01-

18  402.16.  The action agency (here USFS) may prepare a biological assessment to

19  evaluate the potential effects of a proposed action.  50 C.F.R. § 402.12(a).

20         At the conclusion of the formal consultation process, FWS issues a "biological

21  opinion" detailing how the proposed action will affect the listed species.  16 U.S.C.

22  § 1536(b)(3)(A).  The two key conclusions of a biological opinion are (1) whether the

23  proposed action will jeopardize the continued existence of the species and (2) whether

24  the proposed action will destroy or adversely modify critical habitat.  16 U.S.C.

25  § 1536(a)(2).  If FWS determines that there will be take of individual species members

26  that is incidental to the agency action and does not rise to the level of jeopardizing the

27  species, FWS issues an incidental take statement that specifies the impact of such

28  taking on the species.  Id. § 1536(b)(4).  It will also set forth the reasonable and prudent

1  measures proscribed to minimize that impact, and terms and conditions to implement

2  those measures. Id.

3      After consultation on an action has been completed, an agency may be required

4  to reinitiate formal Section 7 consultation under certain circumstances.  Reinitiation of

5  formal consultation is required "where discretionary Federal involvement or control over

6  the action has been retained or is authorized by law" and one of four conditions is met,

7  including: "(b) If new information reveals effects of the action that may affect listed

8  species or critical habitat in a manner or to an extent not previously considered; . . . or

9  (d) If a new species is listed or critical habitat designated that may be affected by the

10  identified action."  50 C.F.R. § 402.16.

11      **B.      National Forest Management Act**

12      The USFS manages the National Forests pursuant to the NFMA and its

13  implementing regulations, which provide for forest planning and management at two

14  levels: the forest-wide level and the individual project level.  See 16 U.S.C. § 1604.  At

15  the forest level, the USFS develops a forest plan, which is a broad, long-term planning

16  document for an administrative unit of the National Forest System.  A forest plan

17  establishes planning goals and objectives for management of forest resources.  Id.

18  § 1604(g)(1)-(3).  At the project level, site-specific projects must be consistent with the

19  applicable forest plan.  Id. § 1604(i); Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d

20  957, 962 (9th Cir. 2002).

21      **C.      National Environmental Policy Act**

22      NEPA serves the dual purpose of informing agency decision-makers of the

23  environmental effects of proposed Federal actions and ensuring that relevant information

24  is made available to the public so that it "may also play a role in both the decision-

25  making process and the implementation of that decision."  Robertson v. Methow Valley

26  Citizens Council, 490 U.S. 332, 349 (1989).  NEPA does not mandate particular results

27  or impose substantive environmental obligations on federal agencies.  Id. at 351-52.

28  Instead, NEPA ensures "that [an] agency will not act on incomplete information, only to

4

regret its decision after it is too late to correct." <u>Marsh v. Or. Natural Res. Council</u>,

490 U.S. 360, 371 (1989).  NEPA requires the preparation of an environmental impact

statement ("EIS") for "major Federal actions significantly affecting the quality of the

human environment . . . ."  42 U.S.C. § 4332(C).  In reviewing NEPA decisions, courts

evaluate whether the analysis includes a "reasonably thorough discussion of the

significant aspects of the probable environmental consequences."  <u>California v. Block</u>,

690 F.2d 753, 761 (9th Cir. 1982) (internal quotation marks omitted).

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Fire Policy Background

Many years of federal fire suppression policy and prior timber harvests have

converted mixed conifer forests into overcrowded forest stands comprised of shade-

tolerant, fire-susceptible tree species.  Defs.' Cross-Mot., ECF No. 29, at 1.  The fire

suppression policy excluded most low and moderate intensity fires from the National

Forests and greatly increased the average time between fires.  While the fire

suppression efforts themselves were successful, the effect of these efforts was

unanticipated.  <u>Id.</u> at 5.  Fuel loadings accumulated above historic levels and the

characteristics and distribution of the forests changed.  <u>Id.</u>  Fires that previously burned

at low to moderate intensities can now use the dense understory to quickly move up into

the canopy layer.  <u>Id.</u>  These fires are risky to fight and can result in a substantial loss to

forest structure.  <u>Id.</u> at 5-6.

### B.     Gemmill Thin Project

There are 21 Late-Successional Reserves ("LSR") within the STNF.  <u>Id.</u> at 6.

They were established by the Northwest Forest Plan to protect and enhance late-

successional and old-growth forest ecosystems that serve as habitats for, among other

species, the NSO.  <u>Id.</u>  The Chanchellula LSR in the STNF covers 26,389 acres.  <u>Id.</u>

///

1    The USFS conducted an LSR Assessment ("LSRA") and determined that the

2  Chanchellula LSR was at risk for a "catastrophic stand-replacing fire" due to the effects

3  of previous fire suppression efforts.  Id.  Overcrowded stands were also suppressing

4  additional growth of large trees and causing delay in the development of old-growth

5  habitat.  Id.  The vigor of old trees was reduced as they competed with smaller trees for

6  limited resources.  Id.  The conditions left the ecosystem more prone to disease and less

7  resistant to fire.  Id.

8    In an attempt to remedy these issues, the USFS approved the Gemmill Thin

9  Project in April 2011.  The purposes of the project are to "reduce the risk of losing

10  existing and developing late-successional habitat due to wildfire," to "restore the use of

11  fire as a tool to maintain lower fuel loading," and to "encourage or accelerate the

12  development of continuous late-successional and old growth habitat."  GAR 143.[4]

13  "Although the Project Area is rated as low to moderate for fire risk and fire hazard under

14  the STNF Fire Management Plan, . . . the '[s]ystem [is] predisposed to high risk of losing

15  key ecosystem components' due to its high departure from historic fire return interval

16  and severity."  Defs.' Cross-Mot. at 6-7 (quoting GAR 1365, 178-79).  Moreover, the

17  Project Area has a "high value" in terms of "monetary worth and non-monetary values

18  such as wildlife habitat and scenery."  GAR 1365.

19    The Project is not intended to prevent wildfires.  Defs.' Cross-Mot. at 7.  To the

20  contrary, the USFS recognizes that wildfire is an important component of late-

21  successional forests.  GAR 194.  Instead, the Project strategically places treatments to

22  protect the highest quality and best habitat, with the goal of changing fire behavior from

23  a destructive, severe, hard-to-control fire, to a fire that it safer to fight with a lower flame

24  length and a slower rate of spread.  GAR 183, 186, 188.  Modeling indicates that the

25  treatments employed by the Project will provide risk reduction benefits extending up to

26  50 years.  GAR 210-13.  In its final iteration, "[t]he Project proposes silvicultural

27    [4] All citations to "GAR" refer to Gemmill Thin Project Administrative Record, which was lodged with
this Court on October 28, 2014.  ECF No. 20.

28

1   treatments designed to move the forest toward one that is more resilient against wildfire

2   and other potentially large-scale disturbances, such as insect infestation and disease."

3   Defs.' Cross-Mot. at 1.  "The Project is also designed to encourage development of old-

4   growth habitat – the most valuable type of habitat for the owl – in mature forests whose

5   growth has stagnated due to the competition for resources among many small trees."  Id.

6            **C.    Project Analysis, the Consultation Process, and Project Approval**

7            It took a number of years and multiple rounds of consultation before the Gemmill

8   Thin Project was finally approved.  The STNF first published its intent to pursue the

9   project in 2005.  In December 2007, the USFS prepared its initial biological assessment,

10  and the FWS issued its original biological opinion the following March.  In April 2009, a

11  final environmental impact statement was issued, as was a Record of Decision ("ROD")

12  approving "Alternative One" of the project.  This original ROD was reversed on

13  administrative appeal due to an inadequate range of alternatives analyzed.

14           On remand, additional alternatives were analyzed and a Final Supplemental

15  Environmental Impact Statement ("FSEIS") was issued in April 2011.  The USFS and the

16  FWS engaged in formal consultation, after which the FWS concluded that the Gemmill

17  Thin Project was not likely to jeopardize the NSO or adversely modify its designated

18  critical habitat.  A new ROD was signed in April 2011 based on the amendments to the

19  FSEIS.  GAR 110.  In that ROD, the USFS selected Alternative Four over Alternative

20  One, but the effects to the Northern Spotted Owl remained the same.

21           In June 2011, however, the FWS issued a Revised Recovery Plan ("RRP") for the

22  NSO.  The RRP described additional management concerns and threats (specifically,

23  barred owls and wildfire) that were not emphasized to the same extent in previous

24  recovery plans.  GAR 22356.  The RPP also recommended "conserving occupied

25  spotted owl sites throughout the range, especially those containing the habitat conditions

26  to support successful reproduction."  GAR 11436.  On August 24, 2011, Plaintiffs filed

27  this action, seeking a declaration from the Court that Defendants' approval of the Project

28  violates the noted environmental laws and asking the Court to enjoin Defendants from

1   proceeding with the Project until they comply with those laws.  Compl., ECF No. 1,

2   ¶ 114.

3       In approximately December 2012, however, a Final Rule was issued revising the

4   NSO's critical habitat.  Given these changes, the USFS requested reinitiation of

5   consultation with the FWS in March 2012.[5]  In August of that year, USFS and FWS met

6   to identify potential modification to the Gemmill Thin Project design that would further

7   reduce effects to NSOs and their habitat and incorporate the goals of the RRP and the

8   2012 revised critical habitat rule.  The USFS subsequently modified the Project.[6]

9       As modified, the project proposes the thinning of 829 acres of dense late-

10  successional forest stands, 225 acres of mixed conifer forest to reconstruct a 30-year-old

11  ridgetop fuelbreak, and 39 acres of 20-year old plantations.  GAR 10549.  It now omits

12  221 acres of planned treatments in nesting/roosting habitat in both the "new" and historic

13  Halls City Creek Owl core areas.[7]  Id.  Diameter limitations have been placed on trees

14  that may be removed in another 127 acres in these areas.[8]  Road reconstruction was

15  reduced by 5.6 miles, and additional protection measures were imposed on all Project

16  units.  Id.; GAR 10662-664.

17      The USFS then prepared a new 2013 Biological Assessment ("Biological

18  Assessment") to analyze the Project as modified.  GAR 10649.  That document provides

19  a comprehensive look at NSO "use and status in each activity center and Owl habitat in

20

21      [5] This action was stayed by stipulation of the parties and order of the Court during the reinitiation
    of consultation.  See ECF No. 16.

22

23      [6] Defendants opted to modify the  Project based on the recommendations in the RRP, but the
    Court notes that throughout the RRP there are multiple statements indicating those recommendations are
    not mandatory.  See, e.g., GAR 11375-76 ("Recovery plans are not regulatory documents; rather, they are

24  created by the Service as guidance to bring about recovery and establish criteria to be used in evaluating
    when recovery has been achieved.").

25      [7] "Core areas" are areas of concentrated owl use in a home range and commonly includes nest

26  and roost sites.  GAR 10665. For the purposes of this project, a core area is determined by creating a .5
    mile radius around an owl activity center.  Id.

27      [8] These limits require retaining all trees greater than 18 inches in diameter at breast height ("dbh")
    in nesting/roosting habitat and all trees greater than 24 inches dbh in foraging habitat.  Id.

28

1    the area, competition from barred owls, and the fire modeling results used to compare

2    the impacts to owl habitat from no treatment and the proposed treatments."  Defs.'

3    Cross-Mot. at 8.  The USFS also performed individual analyses of Project impacts to

4    each owl activity center, including impacts on prey and competitors like the barred owl.

5    The Biological Assessment ultimately "concluded that the Project would likely adversely

6    affect the owl because it would degrade 619 acres of nesting/roosting habitat and 316

7    acres of foraging habitat."  Id. (citing GAR 10717).  "However, the probability of losing

8    owl habitat to fire would be reduced and direct harm or disturbance to breeding activities

9    would be avoided with a limited operating period [("LOP")]."[9]  Id.  "Similarly, while the

10   Project would adversely affect designated critical habitat in the area, it would not impede

11   the functionality of the designation or the critical habitat's ability to support owl recovery."

12   Id.

13        In response, the FWS prepared a new 2014 Biological Opinion ("BiOp"),

14   concluding again that "the Project is not likely to jeopardize the owl or result in adverse

15   modification of designated critical habitat."  Defs.' Cross-Mot. at 9 (citing GAR 10623).

16   The FWS's "no jeopardy" conclusion turned on the facts that: (1) the proposed

17   treatments avoid direct impacts during the breeding season; (2) the adverse effects of

18   habitat degradation are short-term and impact less than 10% of the total suitable habitat

19   in the action area; and (3) the Project will result in long-term benefits to the owl, including

20   retention of late-successional features and a lowered likelihood of habitat loss due to

21   stand replacing fire.  Id.  It reached its "no adverse modification" conclusion because:

22   (1) "the Project will not result in a change to habitat function at the localized level"; and

23   (2) "the adverse effects to habitat function are not significant at the broader provincial

24   and range-wide levels."  Id.  The FWS nonetheless authorized an incidental take in the

25

26        [9] As relevant here, LOPs are intended to "minimize or avoid adverse effects to the spotted owl."
     GAR 10572.  "From February 1 to July 10, [LOPs] prohibit all loud and continuous noise (i.e., chainsaws,
27   yarders, and loaders) and heavy smoke-generating activities within 0.25 mile of known occupied or un-
     surveyed suitable habitat."  Id.  "In addition, [LOPs] prohibit all vegetation removal/cutting/burning from
     February 1 – September 15 within known occupied or unsurveyed suitable habitat."  Id.

28

form of harassment of one pair of adult owls in the "new" Halls City Creek area because Project effects may alter the owls' behavioral patterns (for example, by shifting foraging activity or by potentially reducing the individuals' fitness).  GAR 10625.

In May 2014, the USFS issued a Supplemental Information Report ("SIR") recommending that the Project go forward as modified.  GAR 10545.  The SIR stated:

> [T]he conclusions drawn pertaining to the selected alternative in the Record of Decision (2011) are still valid and fully supported by the reinitiation of consultation with FWS . . . [T]he Gemmill Thin Project, as modified, will meet the project objectives and remain within the range of environmental effects analyzed and documented in the FSEIS.  The project modifications described . . . are not substantial, the effects of project treatments to northern spotted owl and its critical habitat have been analyzed in the FSEIS and Biological Assessment and confirmed by subsequent analysis, and the project's effects (as modified) remains well within the range of actions considered in the FSEIS . . . [A]lthough there is new information regarding barred owls in the project area and the relocation of a northern spotted owl pair, that new information does not suggest the project will affect the environment in a significant manner or to a significant extent not already considered.   The effects to northern spotted owls are expected to be similar to or less than what was originally analyzed, in part because of the additional protections developed through consultation with FWS.
>
> Based upon revising the interdisciplinary team input there are no significant new circumstances or information relevant to environmental concern and impacts associated with the project.  Implementation of the Record of Decision (2011) as now modified should continue.  The analysis above shows that the project, as modified, will not affect the environment in a significant manner or to a significant extent not already considered in the FSEIS.  The project, as modified will move the area toward the desired condition, meet the purpose and need, and provide both short and long term benefits to northern spotted owl.   No additional review or analysis is necessary at this point in time.  Supplemental NEPA analysis of the project modifications is not warranted.   The project should proceed as planned.

GAR 10561-62.  This action resumed in July 2014 and these motions followed.

///

///

///

///

10

1

2

**STANDARD OF REVIEW**

3       Review of Plaintiffs' ESA, NEPA, and NFMA claims is governed by the APA.

4   5 U.S.C. §§ 701-06; San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 601

5   (9th Cir. 2014) (ESA); Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d

6   754, 760 n.5 (9th Cir. 2005) (NEPA and NFMA).  Pursuant to the APA, "[a] person

7   suffering legal wrong because of agency action, or adversely affected or aggrieved by

8   agency action within the meaning of a relevant statute, is entitled to judicial review

9   thereof." 5 U.S.C. § 702.  "[T]he reviewing court shall . . . hold unlawful and set aside

10  agency actions, findings, and conclusions found to be . . . arbitrary, capricious, or an

11  abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or

12  that are "without observance or procedure required by law."  5 U.S.C. § 706(2)(D).

13      The Court's task "is to determine whether the [agency] has considered the

14  relevant factors and articulated a rational connection between the facts found and the

15  choice made."  Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 105

16  (1983).  A reviewing court is required to review "the whole record or those parts of it cited

17  by a party." 5 U.S.C. § 706.  An agency's review is arbitrary and capricious if it fails to

18  consider important aspects of the issues before it, if it supports its decisions with

19  explanations contrary to the evidence, or if its decision is either inherently implausible or

20  contrary to governing law.  Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir.

21  2005).  Review under the APA is "searching and careful."  Ocean Advocates v. U.S.

22  Army Corps of Eng'rs, 402 F.3d 846, 858 (9th Cir. 2004).  However, a court may not

23  substitute its own judgment for that of the agency.  Id.  In reviewing an agency's actions,

24  the standard to be employed is decidedly deferential to the agency's expertise.  Salmon

25  River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir. 1994).

26  ///

27  ///

28  ///

1

**ANALYSIS**

2

3      Plaintiffs contend that, despite the Project modifications USFS implemented after

4   reinitiation of consultation with the FWS, Defendants' project as approved still violates

5   the ESA, NFMA, and NEPA.  Based on review of the administrative record, the Court

6   rejects each of Plaintiffs' arguments.[10]

7      **A.      The Court Will Only Consider Evidence Contained in the**
              **Administrative Record.**

8

9      Before turning to the merits, the Court must address Plaintiffs' reliance on two

   extra-record declarations:  the declaration of Monica Bond (ECF No. 24-5) and the

10  declaration of Denise Boggs (ECF No. 24-4).  Monica Bond is a wildlife biologist who has

11  "been involved in spotted owl research and conservation for the past 15 years."  Bond

12  Decl., ECF No. 24-5, ¶ 4.  In her 30-page declaration, Ms. Bond presents arguments,

13  based on her reading of the FSEIS and the BiOp, regarding what the Court should

14  consider in deciding whether to grant or deny Plaintiffs' Motion for Summary Judgment.

15  Defendants have filed a Motion to Strike the Bond Declaration in its entirety.  ECF

16  No. 28.  Ms. Boggs is the Executive Director of Plaintiff Conservation Congress and her

17  declaration primarily concerns Plaintiffs' standing to bring this action.  However, in two

18  paragraphs, Ms. Boggs opines on the potential danger to the NSO if the Project goes

19  forward.  See Boggs Decl., ECF No. 24-4, ¶¶ 5, 8.  Defendants object to the inclusion of

20  these paragraphs.

21      Generally, "[p]arties may not use 'post-decision information as a new

22  rationalization either for sustaining or attacking the Agency's decision.'"  Ctr. for

23  Biological Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006)

24

25      [10] Plaintiffs argue they have standing to pursue the instant claims.  See Pls.' Mot. at 17.  "An
   association has standing to bring suit on behalf of its members when its members would otherwise have
26  standing to sue in their own right, the interests at stake are germane to the organization's purpose, and
   neither the claim asserted nor the relief requested requires individual members' participation in the
27  lawsuit."  Friends of Earth v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-181 (2000).  Defendants do not
   contest standing, which is also supported by the record.

28

1  (quoting Ass'n of Pac. Fisheries v. EPA, 615 F.2d 794, 811–12 (9th Cir. 1980)).  Review

2  under the APA "is to be based on the full administrative record that was before the

3  [agency] at the time [it] made [its] decision."  Citizens to Pres. Overton Park v. Volpe,

4  401 U.S. 402, 420 (1971).  Plaintiffs nonetheless argue that the Bond and Boggs

5  Declarations should be considered under APA exceptions, a NEPA exception, and an

6  ESA citizen suit exception, and to show irreparable harm.  None of these arguments are

7  well taken.

8  **1.    APA Exceptions**

9  There are four narrowly-construed exceptions to the APA's administrative record

10  requirement:  (1) if the extra-record information is necessary to determine whether the

11  agency has considered all relevant factors and has explained its decision; (2) when the

12  agency has relied on documents not in the record; (3) when supplementing the record is

13  necessary to explain technical terms or complex subject matter; and (4) when plaintiffs

14  make a showing of agency bad faith.  Id.  Plaintiffs have the burden of showing that an

15  exception applies.  When the documents were filed, Plaintiffs did not claim that the

16  declarations fell under an APA exception.[11]  They now claim in their Opposition to the

17  Motion to Strike that exceptions one and three apply.[12]

18  The Court finds that the challenged extra-record statements do not fall under

19  these exceptions because they are not "necessary to determine whether the agency

20  considered all of the relevant factors," or "to explain technical or complex subject matter."

21  The information presented by Bond and Boggs "can either be extracted from the record

22  or is not necessary to this court's review" of the merits of the BiOp, Biological

23  Assessment and FSEIS.   Southwest Ctr. for Biological Diversity v. U.S. Forest Service,

24  100 F.3d 1443, 1451 (9th Cir. 1996).  Indeed, the material contained within the Bond

25  _____

26  [11] In their Motion for Summary Judgment, Plaintiffs generally noted that an exception to the extra-record evidence rule applied because two of Plaintiffs' claims were brought pursuant to the ESA's citizen suit provision.  Pls.' Mot. at 16-17.  That argument is discussed below.

27

28  [12] Notably, Plaintiffs were provided an opportunity to object to the contents of the AR at the beginning of this case and did not note any deficiencies.  See ECF No. 21, ¶¶ 3-5.

1  Declaration is either cumulative of data already present in the RRP (namely, studies on

2  the effect of fire on NSO) or is based on post-decision information.  See Bond Decl.

3  ¶¶ 24, 25 (citing studies from 2014 when the BiOp was published in January 2014).  As

4  a whole, the declarations can accurately be characterized as "extra-record scientific

5  opinion and argument submitted to undermine [the agency's] analyses and conclusions."

6  Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers, 817 F. Supp. 2d 1290, 1301

7  (D. Or. 2011).  Extra-record declarations that challenge the merits of the agency's

8  decision do not fall under any exception.  Environmental Def. Fund v. Costle, 657 F.2d

9  275, 286 (D.C. Cir. 1981).

10                    **2.    NEPA Exception**

11         Plaintiffs go on to argue that since one of the claims was brought under NEPA, an

12  additional exception applies.  "An allegation that an EIS has failed to mention a serious

13  environmental consequence may be sufficient to permit the introduction of new evidence

14  outside of the administrative record."  Animal Def. Council v. Hodel, 840 F.2d 1432, 1437

15  (9th Cir. 1988).  Additionally, the Court may consider extra-record evidence in a NEPA

16  case when the EIS "failed adequately to discuss some reasonable alternative, or

17  otherwise swept stubborn problems or serious criticism under the rug."  Nat'l Audubon

18  Soc'y v. U.S. Forest Serv., 46 F.3d 1437, 1447 (9th Cir. 1993).

19         In application, this exception does not differ greatly from exceptions one and three

20  of the APA discussed above, as both pertain to whether the declarations can point to a

21  matter the agency should have considered but did not.  Once again, Plaintiffs argue that

22  Defendants did not adequately consider the effect of fires on owl populations.  Plaintiffs

23  also claim that the declarations discuss: (1) short-term risks to owls from commercial

24  logging; (2) the fact that NSO territories in the Project Area are below the FWS's

25  thresholds; and (3) the interaction between barred owls and NSO.  However, these

26  statements are made in passing and are not the main focus of the declaration.  The main

27  focus of the declaration is that fire does not pose a threat to the spotted owl and

28  therefore thinning will not benefit the species and will, in fact, harm it.  This information is

1  cumulative of information contained within the record and considered by Defendants in

2  the SIR to the FSEIS.  GAR 10561.

3           **3.      Citizen Suit Exception**

4           Plaintiffs next argue that extra-record information can be considered because the

5  ESA claims in this case were brought under the citizen suit provision.  Plaintiffs rely on a

6  Ninth Circuit opinion, <u>Western Watersheds Project v. Kraayenbrink</u>, 632 F.3d 472

7  (2010), for the proposition that the "APA applies only where there is 'no other adequate

8  remedy in a court,' 5 U.S.C. § 704, and—because the ESA provides a citizen suit

9  remedy—the APA does not apply in such actions . . . Therefore . . . [the Court] may

10 consider evidence outside the administrative record for the limited purposes of reviewing

11 Plaintiffs' ESA claim."  <u>Id.</u> at 497.

12          District courts have come out to different conclusions on whether <u>Kraayenbrink</u>

13 has created a broad exception to the APA extra-record rule for citizen suits.  <u>Compare</u>

14 <u>Or. Natural Desert Ass'n v. Kimbell</u>, 593 F. Supp. 2d 1213, 1216 (D. Or. 2008) and

15 <u>Wildearth Guardians v. U.S. Fed. Emergency Managemt. Agency</u>, No. CV 10-863-PHX-

16 MHM, 2011 WL 905656, at *3 (D. Ariz. Mar. 15, 2011) (finding that the APA rule no

17 longer applies) with <u>Pacific Rivers Council v. Shepard</u>, No. 03:11-cv-422-HU, 2012 WL

18 950032, at *3 (D. Or. Mar. 20, 2012) and <u>Nw. Envtl. Def. Ctr. v. U.S. Army Corps of</u>

19 <u>Engineers</u>, 817 F. Supp. 2d 1290, 1300-01 (D. Or. 2011) (not addressing <u>Kraayenbrink</u>

20 and applying the APA standard and exceptions).  It is not necessary for this Court to

21 address any possible effect of <u>Kraayenbrink</u> may have on decades of established APA

22 case law because even if the Court were to find that the <u>Kraayenbrink</u> decision created a

23 new broad exemption for citizen suits from the APA extra-record rule, the documents in

24 this case would still be excluded given the nature of the claims brought in the suit and

25 the contents of the declaration.

26          The citizen suit provision can only be brought to enforce agency obligations and

27 cannot be used to question a discretionary action.  <u>Bennett v. Spear</u>, 520 U.S. 154, 172

28 (1997). Claims of maladministration of the ESA must be brought under the APA; a citizen

1   suit is only appropriate if the ESA regulations are violated in a way that would subject the

2   regulated party to criminal or civil enforcement.  Id. at 174, 175.  Therefore, Plaintiffs' first

3   ESA claim, which challenges the merits of the BiOp, can only be brought under the APA.

4   Plaintiffs' second ESA claim, which alleges that the Forest Service violated the

5   ESA in the Biological Assessment, can be brought pursuant to the citizen suit provision.

6   However, any extra-record material admitted would have to be related to this claim about

7   the Biological Assessment.  Ms. Bond's declaration is based on the BiOp and FSEIS and

8   not the Biological Assessment.  In fact, Ms. Bond states that she did not even review the

9   Biological Assessment.  See Bond Decl. ¶ 12.   Therefore, this extra-record evidence is

10  not related to the one possible ESA citizen suit claim in this action and cannot be

11  admitted under a potential "citizen suit exemption."

### 4.   Irreparable Harm

13  Finally, Plaintiffs argue that the declarations should be admitted because they

14  show irreparable harm, which the Court must consider because Plaintiffs are requesting

15  permanent injunctive relief.  The Ninth Circuit case cited by Plaintiffs for this proposition,

16  Idaho Watersheds Project v. Hahn, 307 F.3d 815, 833-34 (9th Cir. 2002), concerns

17  permanent injunction proceedings that occurred after a violation of NEPA was found.

18  Because no violations of NEPA, ESA, and NFMA occurred in this case, the issue of

19  injunctive relief need not be reached and no extra-record declarations will be admitted

20  for this purpose.

21  Accordingly, none of Plaintiffs' arguments are persuasive, and Defendants' Motion

22  to Strike is GRANTED.  The Bond Declaration, the noted passages in the Boggs

23  Declaration, and any references to this stricken material in Plaintiffs' Motion for Summary

24  Judgment are hereby stricken.[13]  Because the Court grants Defendants' Motion to Strike,

25  it also will not consider the rebuttal declarations provided by Defendants with their

26  Motion to Strike.  See ECF Nos. 28-3, 28-4.

_____

27  [13] Regardless, even had the Court considered the challenged evidence, the result in this case
    would have been the same.  It is clear that Defendants diligently complied with federal requirements
28  before approving the Project.

1

**B.     The FWS Did Not Violate the ESA.**

2      Plaintiffs make three general arguments with respect to their claims against FWS

3  under the ESA:  (1) the FWS failed to use the best scientific data available in the

4  consultation documents; (2) the FWS's 2014 BiOp is arbitrary and capricious; and (3) the

5  FWS failed to ensure that the Project will not result in the "destruction or adverse

6  modification" of critical habitat.  After reviewing the Administrative Record, the Court

7  concludes that while Plaintiffs' may disagree with the Defendants' findings, those

8  findings are sound.

9                **1.     The FWS relied upon the best scientific and commercial data
                       available.**
10

11      Under the ESA, agencies are required to base their consultations on "the best

12  scientific and commercial data available."  16 U.S.C. § 1536(a)(2).  "The determination of

13  what constitutes the '<u>best</u> scientific data available' belongs to the agency's 'special

14  expertise . . . . When examining this kind of scientific determination, as opposed to

15  simple findings of fact, a reviewing court must generally be at its most deferential.'"

16  <u>San Luis & Delta-Mendota Water Auth.</u>, 747 F.3d at 602 (quoting <u>Baltimore Gas & Elec.</u>

17  <u>Co.</u>, 462 U.S. at 103).  "The best available data requirement merely prohibits an agency

18  from disregarding available scientific evidence that is in some way better than the

19  evidence it relies on."  <u>Kern Cnty. Farm Bureau v. Allen</u>, 450 F.3d 1072, 1080 (9th Cir.

20  2006) (internal quotations omitted).  "Essentially, [the agencies] cannot ignore available

21  biological information."  <u>Id.</u> at 1080-81 (internal quotations omitted).  Plaintiffs contend

22  that Defendants failed to rely on the best scientific and commercial data available

23  because they failed to fully consider RRP recommendations and the Project's fire risks

24  and benefits.

25  ///

26  ///

27  ///

28  ///

17

1              **a.      The FWS fully considered RRP recommendations.**

2          Plaintiffs' first argument with respect to the RRP is that the Project will simplify

3  stand structure and thus runs contrary to the recommendations in Recovery Action 32.[14]

4  However, while there will be some vertical stand simplification since some understory

5  fuels will be removed, the Project is specifically designed to maintain stand complexity

6  and the oldest/largest conifers.  GAR 10691-92; GAR 10572-73.  Indeed, the BiOp

7  makes clear that:

8                    Starting as soon as is safe and practicable after the start of
                   project implementation, STNF will coordinate closely with the
9                    Service, to ensure that anticipated stand conditions are being
                   met.    This will involve field visits and subsequent close
10                   coordination with the biologist project contract administrator.
                   Of special interest are the treatments within NSO core areas
11                   and the retention mosaics of shrubs and sub-merchantable
                   conifers.   This coordination is the best way to ensure the
12                   desired habitat conditions, as well as the purpose and need,
                   would be met.  We determined that method is appropriate
13                   because shrub and small conifer site-specific data is not
                   available and the density of these habitat components varies
14                   greatly within the proposed thinning units, making specific
                   marking guidelines challenging to write and implement from
15                   written direction alone.

16  GAR 10573.

17          Moreover, not only did the FWS consider the RRP recommendations, it modified

18  the Project to better conform to those recommendations by focusing on "treating around

19  high quality habitat within occupied core areas and to minimize the amount of treatment

20  in these critical areas."  GAR 10614.  Plaintiffs argue that even after modification, the

21  Project treatment still occurs within both NSO activity centers and nesting/roosting

22  habitat.  See Pls.' Reply, ECF No. 30, at 3 (citing GAR 10549, 10621).  However,

23  Plaintiffs ignore the fact that while the treatment may occur in high quality habitat, no

24  nesting/roosting habitat will be impacted in any of the "occupied" areas.  GAR 10606-11.

25              [14] Recovery Action 32 states: "Because spotted owl recovery requires well distributed, older and
26  more structurally complex multi-layered conifer forests on Federal and non-federal lands across its range,
   land managers should work with the Service as described . . . to maintain and restore such habitat while
27  allowing for other threats, such as fire and insects, to be addressed by restoration management actions.
   These high-quality spotted owl habitat stands are characterized as having large diameter trees, high
28  amounts of canopy cover, and decadence components such as broken-topped live trees, mistletoe,
   cavities, large snags, and fallen trees."  GAR 11461.

1  Additionally, the FWS uses project design features to maintain habitat function, and

2  specifically found that these project design features accord with the RRP

3  recommendation to retain high quality habitat.  GAR 10614.

4     Plaintiffs next argue that the short-term Project effects run contrary to Recovery

5  Action 10.  Plaintiffs imply that because that action item recommends "[c]onserv[ing]

6  spotted owl sites and high value spotted owl habitat to provide additional demographic

7  support to the spotted owl population," GAR 11437, the Project should not have

8  authorized the incidental take of one pair of owls in the New Halls City Creek area or the

9  degradation of roosting/nesting habitat.  Pls.' Mot., ECF No. 24, at 3-4.  However, in

10  response to the RRP recommendations, among other things, the Project was modified to

11  reduce the impacts to both the currently unoccupied historic and new Halls City Creek

12  activity centers.  Plaintiffs similarly make much of the statement in the RRP that:

13
> The [Fish & Wildlife] Service recommends conserving
14  occupied spotted owl sites throughout the range, especially
> those containing the habitat conditions to support successful
> reproduction. This recommendation is especially important in
15  the short-term, until spotted owl population trends improve
> (Forsman et al. 2011).
16

17  GAR011436.  However, they ignore additional clarification by the FWS in that same

18  section:

19
> Where the modeling output and/or examination on the ground
20  indicate that forest stands could and should be enhanced or
> developed through vegetation management activities to
> improve long-term habitat conditions, or to create improved
21  habitat for spotted owls, larger habitat patches, or increased
> connectivity between patches, they should generally be
22  encouraged even if they result in short-term impacts to
> existing spotted owls. However, such a process should occur
23  where a determination is made that these longer term goals
> outweigh short-term impacts.
24

25  GAR011438.  The FWS also noted:

26
> As a general rule, forest management activities that are likely
> to diminish a home range's capability to support spotted owl
27  occupancy, survival and reproduction in the long-term should
> be discouraged.  However, we recognize that land managers
28  have a variety of forest management obligations and that

1
2
3
4
5
6
7
8

> spotted owls may not be the sole driver in these decisions. Here, active forest management may be necessary to maintain or improve ecological conditions. We support projects whose intent is to provide long-term benefits to forest resiliency and restore natural forest dynamic process, when this management is implemented in a landscape context and with carefully applied prescriptions to promote longterm forest health. Examples of active management projects include forest stand restoration, fire risk reduction, treatment of insect infestations and disease and the restoration of high quality early seral habitat as described by Swanson et al. (2010). It is recognized that these projects may have both short and/or long-term effects to spotted owls and that treatments will be designed to minimize impacts as much as possible in keeping with project's intent.

9   GAR 11439-40.[15] Thus, the RRP does not recommend forgoing all land management

10  activities to avoid short-term consequences to the NSO, and instead appears to support

11  the proper implementation of projects like this.[16]

12      Plaintiffs also imply that all treatment in core areas should be deferred because

13  these "high-value habitat areas" were excluded from other projects. Pls.' Mot. at 19.

14  After reconsultation, however, the Project was modified so that it did defer treatment for

15  221 acres of nesting/roosting habitat in the Halls City Creek core areas. GAR 10549.

16  Moreover, Project features will ensure effects are minimized and stand complexity

17  retained. See GAR 10594-95 (discussing review of the thinning at the time of

18  implementation by FWS personnel "to ensure that the assumptions that habitat will be

19  degraded or downgraded are correct"). Given the deference afforded the FWS under an

20  APA review, the Court rejects this argument as well.

21      Finally, Plaintiffs argue that the FWS failed to disclose scientific research

22  undermining the theory that logging large trees serves to save the forest from fire. Pls.'

23

24      [15] These are not the only RPP excerpts indicating project management mandates the consideration of multiple factors, not just the short term effects on the NSO. See, e.g., GAR 11381
25  ("Vegetation management actions that may have short-term impacts but are potentially beneficial to occupied spotted owl sites in the long-term meet the goals of ecosystem conservation. Such actions may
26  include silvicultural treatments that promote ecological restoration and are expected to reduce future losses of spotted owl habitat and improve overall forest ecosystem resilience to climate change, which
27  should result in more habitat retained on the landscape for longer periods of time.").

      [16] Of course, it should not be assumed that all short-term impacts to the NSO are negative. To the
28  contrary, the BiOp discusses short-term benefits to the Owl as well. GAR 10599-600.

1   Mot. at 27.  The only evidence Plaintiffs point to in support of this argument is the extra-

2   record Declaration of Monica Bond (ECF No. 24-5).  Not only is her declaration

3   inadmissible, as discussed above, but the focus of Ms. Bond's discussion is a study that

4   is already contained in the administrative record and cited in the BiOp.  See GAR 10576,

5   10600 (citing to "Skinner 2005" and "Agee and Skinner 2005").  Given that the FWS

6   already considered this evidence, this argument is also rejected.

7             **b.      The FWS has considered the Project's fire risks and
                         benefits.**

8

9         In arguing that the FWS failed to consider the Project's fire risks and benefits,

10  Plaintiffs essentially just question the need for the Project and whether there will ever

11  actually be long-term benefits to the NSO.  As a threshold matter, however, Plaintiffs'

12  arguments are flawed because they ignore any non-fire need for the Project.  For

13  example, due to past fire suppression policies, trees have not been naturally thinned,

14  resulting in overcrowded conditions.  This overcrowding has made some of the largest

15  and oldest trees more vulnerable to disease due to the competition for resources.

16        In addition, contrary to the evidence in the record, Plaintiffs repeatedly assert that

17  the fire risk in the Project Area is low to moderate.  While that is historically accurate, fire

18  suppression efforts have changed the historical fire regime to one of infrequent

19  moderate-to-high intensity fires in these stands. GAR 9304; see also GAR 10761-62

20  (explaining the discrepancy between the Fire Report and the Biological Assessment on

21  this issue).  The fire rating assessment also contains a qualitative aspect that takes into

22  consideration the high monetary and non-monetary values of the land, including wildlife

23  values.  See GAR 10766.

24        Plaintiffs also argue that Defendants failed to employ stand-level modeling to

25  determine fire behavior in this specific Project Area.  Pls.' Mot at 8, 29; Pls.' Reply at 4

26  (citing GAR 10767).  Contrary to this assertion, stand-level modeling was conducted

27  using data from the Project Area.  GAR 10682.  Based on this modeling and the record

28  ///

1    as a whole, the risk of fire in the Project Area is high and there is an elevated risk of

2    future large and destructive fires.  GAR 176, 10683.

3         Plaintiffs' biggest complaint is that the FWS failed to consider whether fire actually

4    poses a risk of harm to NSOs.  Pls.' Mot. at 7.  To the contrary, however, the

5    administrative record is replete with data indicating that fire may reduce canopy cover to

6    the point where habitat is no longer suitable for nesting and roosting.  GAR 10684.  A

7    large fire could even reduce canopy cover below the threshold for connectivity habitat.

8    Id.  Moreover, although Plaintiffs point to evidence that NSOs do use burned habitat, at

9    least to some extent, the RRP specifically addressed that evidence and considered how

10   fire severity and habitat function might be related.  GAR 11423-25.  While the RRP

11   acknowledged that "there are still many unknowns regarding how much fire benefits or

12   adversely affects spotted owl habitat," GAR 11425, the studies tended to show that while

13   owls may have continued to roost in areas of low to moderate severity burns, they

14   generally avoided high severity burns or used them for foraging.  GAR 11424.  As the

15   purpose of the Project is to reduce high severity burns in favor of low to moderate

16   severity burns, the Project should reduce risks to NSO.

17        Aside from their substantive disputes, Plaintiffs also take issue with the fact that

18   neither the 2013 Biological Assessment nor the BiOp cite to the evidence regarding the

19   use of burned habitat by NSOs, though one such study is included in the record for this

20   case—Bond et al. (2002), FWS-AR2-10312.  This argument overlooks the fact that all of

21   this information was analyzed in the FWS's RPP.  GAR 11423-25.  Plaintiffs cite to no

22   authority requiring the FWS or the USFS to have looked beyond the RRP's discussion or

23   to have included the citations from the RRP in their subsequent documents.  Thus, this

24   argument fails as well.

25        Finally, Plaintiffs' argument that the long-term fire reduction benefits will be

26   minimal is unpersuasive.  Plaintiffs point to the fact that in 50 years the fuel build-up in

27   the Project Area will be similar in the treatment and non-treatment scenarios.  Pls. Mot.

28   at 6.  Plaintiffs ignore that fact that the record shows that the Project will reduce fuel

1  build-up by approximately 25 tons per acre and that the fuel build-up will gradually grow

2  until it approaches pre-Project levels in roughly 50 years.  GAR 10686.  Without this

3  reduction, this habitat "would not likely survive to provide spotted owl habitat after a late-

4  summer fire."  GAR 10685.  While Plaintiffs may think this "temporary" risk reduction is

5  not worth the impact on the NSOs, this is another instance where the Court defers to the

6  expert judgment of the agencies.

7            **2.**      **Each of Plaintiffs' specific attacks on the BiOp lack merit.**

8        Plaintiffs also direct a number of specific challenges at the BiOp.  Namely,

9  according to Plaintiffs: (1) the Project results in unauthorized "take";[17] (2) the FWS failed

10  to properly account for the habitat effects of landings; (3) the FWS similarly failed to

11  adequately account for competition from barred owls; and (4) the FWS's cumulative

12  effects analysis is flawed.  For the following reasons, each of these contentions may be

13  rejected.

14        As to their first argument, Plaintiffs contend that four of the six activity centers

15  located within the Project already have less than the recommended acreage for the

16  relevant habitat types (nesting/roosting and foraging) and further degradation will thus

17  result in unaccounted for take.  Pls.' Mot. at 22-25.  This "presumption of take" argument

18  has been rejected previously in this district.  <u>Conservation Cong. v. U.S. Forest Serv.</u>,

19  No. 2:12-cv-02800-TLN-CKD, 2014 WL 2092385, at *11 (E.D. Cal. May 16, 2014).

20  Regardless, the FWS conducted a qualitative as well as quantitative analysis of whether

21  a take would occur and modified the project to add safeguards, such as LOPs.

22  Additionally, the recommended acreage to which Plaintiffs refer is just that, a

23  recommendation.  <u>See</u> GAR 10583 ("these recommended habitat amounts are

24  guidelines and do not represent strict thresholds").  Plaintiffs cite no evidence supporting

25  the argument that the FWS is required to justify a departure from those recommended

26  thresholds.

27         [17] "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

28

1    Plaintiffs' argument that the FWS failed to account for habitat effects of the

2    landings is equally unpersuasive.  See Pls.' Mot. at 24-25.[18]  Plaintiffs' argument

3    appears to stem from the fact that the 2013 Biological Assessment considered these

4    landings "removed," but the BiOp does not.  "The term removed pertains to treatments

5    that reduce habitat elements to the degree that habitat will no longer function as suitable

6    for NSO."  GAR 10592 (emphasis omitted).  As the BiOp explains, however:

> The effects of temporary road and landing construction in the
> past have been categorized as "removal" because the
> vegetation is completely removed.  However, the scope and
> scale of small (0.25 to 0.5 acre) gaps in otherwise large and
> contiguous blocks of habitat does not significantly alter
> function of the habitat or average condition (or calculated
> mean value for individual habitat parameters) within a stand
> when considering the ability of the NSO to use the area.  It is
> much more likely that the creation of these small gaps,
> dispersed throughout the project area and comprising no
> more than 20 acres distributed across the action area, will
> have minimal effect on breeding, feeding, sheltering, or
> persistence of spotted owls.  Due to their small size, their
> distribution across the project area, and the overall amount of
> habitat affected within the action area, the effects of landing
> and temporary road construction in the aggregate are
> considered negligible, and therefore effects to NSO are
> expected to be insignificant and discountable.

17   GAR 10598-99.  Given the difference in the post-modification landings from those

18   originally contemplated and the FWS's reasoned and thorough justification for its

19   conclusion, Plaintiffs' argument is without support.

20    Further, Plaintiffs' argument that the FWS did not properly account for competition

21   from barred owls is not borne out by the record.  The BiOp considers whether the Project

22   "could potentially act to exacerbate further competitive interactions" between barred and

23   spotted owls, GAR 10606, and concluded that it would not.  GAR 10614.  Additionally,

24   the BiOp incorporates the RRP, which specifically addresses increasing threats from

25   barred owls but acknowledges that "substantial information gaps regarding ecological

26

27   [18] The modified Project uses more frequent but smaller landings rather than fewer larger landings
     and provides safeguards to avoid the cutting of trees greater than 24 inches dbh.  GAR 10571.  While
     these small landings range from .25 to .50 acres, in the interest of being conservative, the Defendants
28   estimated all of the landings would be .50 acres.  GAR 10569, n.2.

24

1   interactions between spotted owls and barred owls, and how those interactions may be

2   managed to meet the Recovery Criteria."  GAR 11456.  Rather than recommending a

3   "no treatment approach" until those information gaps could be closed, the FWS

4   explained that:

5           Protecting these forests should provide spotted owls high-
            quality refugia habitat from the negative competitive
6           interactions with barred owls that are likely occurring where
            the two species' home ranges overlap.   Maintaining or
7           restoring these forests should allow time to determine both
            the competitive effects of barred owls on spotted owls and
8           the effectiveness of barred owl removal measures.

9   GAR 11461.  In sum, the FWS considered the effects of the barred owl and ensured that

10  the Project was tailored to minimize that threat to the extent possible.

11          Finally, there is no indication in the record that the FWS improperly conducted

12  their cumulative effects analysis.  "Cumulative effects" under the ESA are defined as

13  "effects of future State or private activities, not involving Federal activities, that are

14  reasonably certain to occur within the action area of the Federal action subject to

15  consultation."  50 C.F.R § 402.02.  The FWS verified that there are no future State or

16  private timber harvests planned.  GAR 10622, 10716.  Plaintiffs offer no evidence that

17  anything further was required.

18               **3.      The FWS properly determined that the Project will not
                          adversely modify designated critical habitat.**
19

20          For a number of reasons, Plaintiffs disagree with the FWS's conclusion that the

21  Project will not adversely modify designated critical habitat.  "For purposes of the

22  adverse modification determination, the effects of the proposed Federal action on critical

23  habitat are evaluated in the context of the range-wide condition of the critical habitat,

24  taking into account any cumulative effects, to determine if the range-wide critical habitat

25  would remain functional to serve its intended recovery goal for the NSO."  GAR 10616.

26          Plaintiffs first take issue with the FWS's critical habitat analysis to the extent that it

27  compares the impact of the Project Area to the range-wide condition of the critical habit

28  designation.  Essentially, Plaintiffs contend there can never be a finding that critical

1   habitat was adversely modified because the range is too big, thus distorting the

2   numbers.  The Ninth Circuit has rejected this argument where there is no "evidence in

3   the record that some localized risk was improperly hidden by use of large scale

4   analysis."  Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv., 378 F.3d 1059,

5   1075 (9th Cir. 2004).  Under such circumstances, a court should not "second-guess the

6   FWS."  Id.  Because Plaintiffs point to no localized risk hidden by the larger scale

7   analysis, there is no reason for this Court to second guess the FWS's decision to use the

8   large scale analysis.   Regardless, the BiOp evaluated localized risks as well.  See GAR

9   10619-22.

10      Plaintiffs then argue that the adverse modification analysis is flawed because the

11   FWS compares the effect of the current Project against the entire range, including those

12   lands that may previously have been "degraded."  "Degraded" is a term of art used by

13   the federal agencies.  See Conservation Cong. v. U.S. Forest Serv., No. CIV S-11-2605

14   LKK/EFB, 2012 WL 2339765 (E.D. Cal. June 19, 2012).  Here, the term "degraded"

15   signifies "when treatments have a negative influence on the quality of habitat by the

16   removal or reduction of NSO habitat elements but not to the degree where existing

17   habitat function is changed."  GAR 10592.  Essentially, Plaintiffs would have the FWS

18   omit from the range any prior lands that may have been degraded, even though that land

19   retained its habitat function.  The Court finds no support for this argument in the record

20   or the case law, and this argument is thus rejected. Moreover, the Court finds that the

21   FWS fully considered the effects of past projects on this Project Area.  See GAR 10618-

22   19; BiOp Appendix A, FWS-AR2-1874-8; BiOp Appendix C, FWS-AR2-1912-13.

23      Finally, Plaintiffs contend that there is an adverse modification by default if critical

24   habitat of a certain type in the core and home ranges falls below a specified level.  As

25   already indicated, these threshold levels are recommendations only.  See GAR 10583.

26   In addition, the FWS extensively analyzed all areas relevant to Plaintiffs' instant

27   argument and exercised its judgment in concluding that no adverse modification of

28   critical designated habitat would occur.  GAR 10619-22.

1    Given all of the above, Plaintiffs' ESA arguments fail and judgment is entered in

2    favor of the FWS on the ESA claim against it.

3           **C.     The USFS Did Not Violate the ESA.**

4    Plaintiffs separately argue that the USFS has violated the ESA by:  (1) "relying on

5    the flawed FWS Biological Opinion to approve the Gemmill Thin Project"; (2) failing to

6    use the best evidence in preparing its Biological Assessment; and (3) failing to ensure

7    "that the effects of the Gemmill project will not jeopardize the continued existence of the

8    northern spotted owl or adversely modify spotted owl critical habitat."  FAC ¶¶ 109-116.

9    For the reasons discussed above, these arguments also fail.  The BiOp was not flawed,

10   Plaintiffs cannot point to "better evidence" that was not considered by Defendants, and

11   the no jeopardy determination was not in error.  Additionally, the USFS was entitled to

12   rely on the BiOp unless Plaintiffs can point to "new" information that USFS did not take

13   into consideration and which challenges the BiOp's conclusions.  Pyramid Lake Paiute

14   Tribe of Indians v. U.S. Dep't of Navy, 898 F.2d 1410, 1415 (9th Cir. 1990).  Plaintiffs are

15   unable to point to any new information that was not considered by Defendants and

16   effectively challenges the conclusions of the BiOp.  Thus, summary judgment in favor of

17   USFS as to Plaintiffs' ESA claim is appropriate.

18          **D.     The Project Complies with the NFMA.**

19   Plaintiffs next argue that the USFS violated the NFMA because the Project is

20   inconsistent with the STNF Land Resource Management plan ("LRMP"), which

21   incorporates the National Forest Plan ("NFP") and the LSRA.  According to Plaintiffs, the

22   LSRA's goal is to "maintain protect and restore conditions of late-successional

23   associated species," and that the LSRA's objectives are to protect existing late-

24   successional habitat from threats, to promote development of late-successional

25   characteristics, to protect mid and early successional vegetation from loss, and to

26   promote connectivity of late-successional habitats.  Pls.' Mot. at 30 (quoting GAR 8588-

27   89).  Plaintiffs thus contend that because the Project treats late-successional forests at

28   all, it violates these plans by default.  Plaintiffs' instant argument is unpersuasive

1    because their purported authority is taken out of context.  When the documents are read

2    as a whole, it is clear that the Project is in compliance.

3          Plaintiffs' first argument is simply that the Gemmill Project will violate plan

4    directives on their face.  To support their argument, Plaintiffs quote from various portions

5    of the documents as follows:

6
        Thinning to reduce risk is appropriate <u>in adjacent</u> non-late-
7            successional stands and most often is needed prior to using
        other fuel reduction techniques, such as prescribed fire.  GAR
8            8592 (emphasis added).

9            Younger stands should receive priority for treatment over
        older stands . . . .  Only stands less than 150 years of age
10           should be considered for treatment.  Stands older than this
        will not respond much quicker than the no treatment
11           alternative.  GAR 8602.

12           Silvicultural activities aimed at reducing risk shall focus on
        younger stands in [LSRs] . . . [T]reatments should not
13           generally result in degeneration of currently suitable owl
        habitat . . . . GAR  7947.

14

15         However, when read in context, it is clear that these excerpts are not absolute

16   directives.  Rather, these documents set goals and objectives that focus on young

17   stands and avoid older ones; they do not prohibit treatments in older stands.  For

18   example, the LMRP lists a number of management practices permitted in late-

19   successional reserves, including "vegetation treatment by mechanical . . . methods to

20   protect forest resources from loss to wildfire, pathogens and insects."  GAR 7953.  The

21   LSRA similarly notes that "[i]n provinces which are in a condition of elevated risk to

22   large-scale disturbance, management which goes beyond the guidelines contained in

23   the [Northwest Forest Plan Record of Decision] may be considered . . . Consequently,

24   management activities designed to reduce risk levels are encouraged in those LSRs

25   even if a portion of the activities must take place in currently late-successional habitat."

26   GAR 8588.  More specifically, "[w]hile risk reduction efforts should generally be focused

27   on young stands, activities in older stands may be appropriate if:  (1) the proposed

28   management activities will clearly result in greater assurances of long-term maintenance

1   of habitat, (2) the activities are clearly needed to reduce risks, and (3) the activities will

2   not prevent the LSR from playing an effective role in the objectives for which they were

3   established."  Id.

4        While Plaintiffs argue that the benefits here do not "clearly" outweigh the risks,

5   given the threat of catastrophic wildfire in the Gemmill Project Area, treatment of late-

6   successional forests is consistent with the LMRP, the LSRA, and the NFP.  Based on

7   analysis and stand modeling of the proposed alternatives, treatment in existing late-

8   successional habitat should maintain long-term habit, even if a catastrophic fire were to

9   occur.  GAR 210-13.  Namely, treatments will reduce the loss to canopy cover and, in

10  mature stands, these risks should be reduced for at least 50 years.  GAR 210.

11       Finally, the proposed treatments will not undermine the LSRA's goal of providing

12  habitat for late-successional species, such as the spotted owl.  As discussed above, the

13  Project is designed to maintain key habitat components and to improve habitat over the

14  long run.  Indeed, the Regional Ecosystem Office's interagency Late-Successional

15  Reserve Work Group determined the proposed treatments in older stands are

16  "appropriate in this situation" and are "consistent with the [Northwest Forest Plan's]

17  Standard[s] and Guidelines for Risk Reduction Projects in LSRs."  GAR 1216.[19]

18  Essentially, Plaintiffs arguments only succeed if certain phrases are viewed in isolation

19  as prohibiting all treatment in LSRs.  That is simply not the case, as these very complex

20  plans themselves recognize.[20]

21       Plaintiffs next argue that the USFS inconsistently uses the term "thinning from

22  below."  The FSEIS explains: "Trees marked for removal with this 'thinning from below'

---

[19] It further concluded that the USFS had "done the analysis and modeling necessary to demonstrate that treatment of older stands is appropriate," and that analysis indicated that "[t]he proposed thinning treatments will dramatically reduce the likelihood of loss of overstory conifers (canopy closure) due to late summer fire into the future."  GAR 1217.  Thus, contrary to Plaintiffs' arguments, the USFS did employ stand modeling and the modeling has been evaluated and determined proper within the agencies.

[20] In their Reply, Plaintiffs offer almost no argument to rebut Defendants' positions.  Plaintiffs point primarily to minutes from a 2005 meeting in which there is a note indicating: "Proposing to treat stands in excess of 80 years old, need forest plan amendment."  GAR 7453.  This very clearly is not an appropriate agency interpretation on which the Court should rely, especially in light of all of the other documents indicating that treatment is permitted.

1  would start with the smallest least healthy conifers and progressively involve larger trees

2  until the existing 70 to 90 percent canopy cover is reduced to approximately 60 percent

3  . . . ."  GAR 371.  Plaintiffs contend this is the commonly understood meaning of the

4  phrase.  Pls.' Mot. at 31.  However, Project documents go on to state that, in old growth

5  stands,

6

7  > [t]he largest and oldest predominant or legacy trees within each stand would be retained and competing understory trees would be removed within a zone about 1 1/2 the width of the old tree crowns.  A sufficient number of smaller trees would be removed to reduce the number of trees per acre to a level that provides an improved competitive advantage for the larger older trees and removes fuel ladders that may threaten the remaining trees and adjacent stands.

8

9

10

11  GAR 371.

12      According to the USFS, although it differentiates the two thinning treatments,

13  "they are mixed within the mapped units" and "[t]he two general thinning prescriptions

14  . . . will be blended within each unit depending upon site specific conditions."  Id.  Plaintiff

15  thus contends that the USFS is using the term "thinning from below" when it intends to

16  remove trees of up to 24 inches diameter.  Pls.' Mot. at 32.  "Instead of starting with the

17  smallest trees and working up in diameter classes until the desired density is

18  reached . . . some of the largest trees are retained but tall trees within at least 36-feet,

19  regardless of their size, are removed."  Id.  According to Plaintiffs, this violates the

20  LMRP, NFP, and LSRA.

21      This argument fails because the phrase "thinning from below" as used in old-

22  growth stands is well documented, consistent with the term's "normal" usage, and does

23  not create unexpected results.  The point, regardless of modifications in treatment type,

24  is to keep the largest and healthiest trees.  Even if the manners in treating were different,

25  nothing in the record indicates either method is contrary to the mandates of the LMRP,

26  NFP, or LSRA.

27      Plaintiffs go on to argue that the Project violates old-growth and wildlife standards.

28  Namely, the LMRP contains a section called "Desired Future Condition," in which it

1  states that "[d]ispersion habitat requirements for the northern spotted owl/late-

2  successional dependent species are met by a combination of [, among other

3  things,] . . . [f]ifteen percent Old-Growth over entire watershed and within units . . . ."

4  GAR 8036.  Plaintiff contends that because the watershed where Gemmill is located

5  "includes approximately 9% old growth habitat," no further removal is permissible.  Pls.'

6  Mot. at 33 (quoting GAR 483).  Again, however, the "Desired Future Condition"

7  discussion does not impose mandatory requirements on the USFS's land management

8  decisions.  Regardless, no old-growth stands or large trees will be removed to construct

9  landings.   These landings will be placed within mature stands (rather than old-growth),

10  and thus no old-growth habitat will be impacted.  GAR 10659, 10690.

11        Finally, Plaintiffs argue that the LMRP provides that STNF projects should

12  "[m]aintain and/or enhance habitat for [threatened, endangered and sensitive] species

13  consistent with individual species recovery plans."  Pls.' Mot. at 33-34.  According to

14  Plaintiffs, the Project is not consistent with the RRP and thus fails on this point as well.

15  For those reasons already addressed above, specifically that RRP recommendations are

16  not mandatory and the Project is consistent with the RRP in any event, Plaintiffs'

17  argument must be rejected.

18        In sum, Plaintiffs fail to point to any inconsistency between the Gemmill Project

19  and any of the above plans such that a violation of the NFMA might be found.

20  Accordingly, judgment is entered for the Defendants as to the NFMA claims.

21        **E.      The USFS Did Not Violate NEPA.**

22        In support of their NEPA claim, Plaintiffs argue that: (1) "the USFS failed to

23  analyze and disclose scientific research on the benefits of fire to the NSO and other

24  wildlife habitat"; (2) "the USFS analyzed the cumulative effects of 'removed/downgraded'

25  NSO critical habitat, but failed to consider the cumulative effects of projects that have

26  'degraded' critical habitat in the Chanchellula LSR or other parts of the STNF"; and

27  (3) for these cumulative effects, "the FEIS continually refers to a table which lists projects

28  and other actions in the vicinity without providing any quantitative analysis of, for

31

1    example, how remaining NSO habitat is functioning or not functioning."[21]  Pls.' Mot. at

2    34-35.  As such, Plaintiffs contend that the USFS "fail[ed] to take a 'hard look' at the

3    Gemmill Thin Project's impacts, thus violating NEPA.

4         As discussed above, the FWS did analyze the relationships between fire and the

5    NSO.  In fact, the RRP contains a discussion of the very science Plaintiffs contend

6    should have been considered.  In Reply, Plaintiffs argue that the USFS cannot benefit by

7    pointing to the RRP because the FSEIS predates the RRP and references only the 1992

8    Recovery Plan, not the 2011 revised version.  This argument might be persuasive if the

9    USFS had not issued a Supplemental Information Report after re-evaluating the Project

10   in light of new information (including issuance of the 2011 RRP).  In the Supplemental

11   Report, the USFS made clear that it was issuing its new findings after reinitiation of

12   consultation based on the issuance of the RRP, among other things.  The Report notes:

13
14
15
16
17
18
> While the 2011 RRP was released since the Record of
> Decision for the Gemmill Thin Project (2011), Gemmil Thin
> Project treatments are consistent with the strategy provided
> in the RRP, as confirmed by the FWS.  The RRP has been
> addressed through the reinitiated consultation process and
> incorporated into the 2013 [Biological Assessment] and 2014
> Biological Opinion and does not present any new and
> significant information regarding project effects that was not
> previously considered in the Final EIS and Biological
> Assessment prepared for the Gemmill Thin Project.

19   GAR 10558.  It then goes on to conclude that "[t]he effects to northern spotted owl are

20   expected to be similar to or less than what was originally analyzed, in part because of

21   the additional protections developed through consultation with FWS."  GAR 10562.

22   Since the effects of the modified action "remain[] well within the range of actions

23   considered in the FSEIS," GAR 10561, NEPA has been satisfied.

24   ///

25         [21] Procedurally, Defendants argue that Plaintiffs failed to administratively exhaust a claim that the
26   USFS failed to disclose scientific evidence pertaining to the effectiveness of logging large trees to reduce
     fire risk.  It appears to the Court that this is correct as this argument was not discussed during the
     administrative process.  See GAR 59-86 (Plaintiff's administrative appeal); Native Ecosystems Council v.
27   Dombeck, 304 F.3d 886, 899 (9th Cir. 2002) (exhaustion occurs when "the appeal, taken as a whole,
     provided sufficient notice to the Forest Service" of the alleged NEPA violation).

28

1      Moreover, as Defendants note, the USFS "chose an appropriate geographic

2  range for cumulative impacts analysis, explained the basis for the choice, and provided a

3  detailed analysis of the past, present, and reasonably foreseeable future actions on owl

4  habitat and its function."  Defs.' Cross-Mot. at 39.  In their Reply, Plaintiffs do not

5  address this argument or offer any further reason as to why approval of the Project was

6  arbitrary and capricious.  As such, the Court finds that Defendants have conducted the

7  hard look required by NEPA.

8      Accordingly, judgment is entered as to Defendants on Plaintiffs' NEPA claims.

9

10                         **CONCLUSION**

11

12      For the foregoing reasons, Defendants' Motion to Strike (ECF No. 28) is

13  GRANTED, Defendants' Cross-Motion for Summary Judgment (ECF No. 29) is

14  GRANTED, and Plaintiffs' Motion for Summary Judgment (ECF No. 24) is DENIED.  The

15  Clerk of the Court is directed to enter judgment in favor of Defendants and close this

16  case.

17      IT IS SO ORDERED.

18  Dated:  September 8, 2015

19

20

21                    MORRISON C. ENGLAND, JR., CHIEF JUDGE

22                    UNITED STATES DISTRICT COURT

23

24

25

26

27

28